UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

DEMETRIUS MOLINA,

                  **DECISION AND ORDER**
        Petitioner,         **No. 12-CV-00333-MAT**

    -vs-

HAROLD D. GRAHAM,
individually and in his official
capacity as the Superintendent of
the Auburn Correctional Facility,
New York State Department of
Correction Services

        Respondent.

_____

## I. Introduction

Petitioner Demetrius E. Molina ("Petitioner"), through counsel, has filed a timely petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging the constitutionality of his custody pursuant to a judgment entered July 28, 2009, in New York State, Chemung County Court, convicting him, after a jury trial, of Murder in the Second Degree (N.Y. Penal Law ("Penal Law") § 125.25 [2]), Manslaughter in the First Degree (Penal Law § 125.20 [1]), and Attempted Murder in the Second Degree (Penal Law §§ 110, 125.25 [1]), two counts of Criminal Use of a Firearm in the First Degree (Penal Law §§ 265.09 [1][a], [b]), and Criminal Possession of a Weapon in the Second Degree (Penal Law § 265.01 [1][b]).[1]

---

[1]

On October 22, 2010, the Appellate Division, Third Department modified Petitioner's judgment of conviction by vacating his murder and manslaughter convictions and otherwise unanimously affirmed the judgment of conviction. People v. Molina, 79 A.D.3d 1371 (3d Dep't 2010).

For the reasons stated below, habeas relief is denied and the petition is dismissed.

## II.  Factual Background and Procedural History

### A.   The Trial

### 1.   The People's Case

On the night of July 31, 2008, Cora Watkins ("Watkins") went to Lando's nightclub in Corning, New York.  Trial Trans. [T.T.] 147-148.  While there, Watkins noticed people she knew to be from South Carolina, including a man that she knew as "Big Boy." T.T. 148-149.  She also saw Petitioner, Eric Knox ("Knox"), and Romondo Ross ("Ross").  T.T. 149-150.  Just before closing time, Watkins witnessed an argument between "Big Boy" and Ross. T.T. 151.  During this argument, Watkins heard "shouts" that this argument would continue in Elmira.  T.T. 152-153.  She was unable to identify exactly what was said because everyone was "rushing to leave because the police were there."  T.T.  153.  At around 1:30 a.m., Watkins left Lando's and returned to her house where she remained outside talking on her cell phone.  T.T. 154-155.

Following the argument, Knox called Jarvis Harvard ("Harvard"), a friend of Petitioner, and informed him that there was some "drama going on" with the men from South Carolina. T.T. 218-223.  Harvard understood that statement to mean that there was "like a fight or something."  T.T. 223.  Harvard, who was at home at the time of the call, told Knox that he would meet him at Hathorn Court.  T.T. 223.  Harvard then drove from his home in

Corning to Elmira where he met Petitioner, Knox, and Ross. T.T. 225-226.  The group of men walked to Woodlawn Avenue towards Hathorn Court.  Upon entering Hathorn Court, they were joined by Bruce Bacome and Aaron Bacome.  T.T. 227-231.

Watkins, who was still outside, saw a car park on a nearby street.  According to her, three or four people exited the car and walked towards Hathorn Court.  T.T. 155-156.  Watkins was not able to identify the people who got out of the car, but she called "Big Boy" to give him a "heads up" and to tell him to be careful. T.T. 158-161.

At approximately 1:30 a.m., Courtney Wallace ("Wallace") was on the porch outside 352 Woodlawn Avenue in Hathorn Court. T.T. 174-175.  She was with a group of friends that included Derrick Peoples ("Peoples") and other men from South Carolina. T.T. 175.  The group on the porch was sitting, talking, laughing, and smoking when Wallace saw five to ten people walk across the field from her left.  T.T. 177-178.  Wallace was unable to see clearly enough to identify any of the people approaching from the field.  T.T. 178.

According to Harvard, Petitioner then pulled a gun from his waistband and began shooting.[2]  Harvard turned and ran away.

---

[2]
    The trial transcript reflects that Harvard's direct examination was interrupted by comments and/or looks by members of the audience who apparently knew Harvard.  T.T. 232-234.  In response to same, Harvard stated, "if you guys was in my shoes, you would do the same thing. Yo, real talk, you all know that. You all know that.  So, don't you all sit back there like that, man.  Real talk. Don't do none of that smirks and stuff, man.  Like I said, if you guys was in my shoes, everybody would have broke down.  I'm just trying to live my life and tell the truth.  That's all I'm doing.  So, if all you guys back there that hate me like that, that's the straight.  Cool with me."  T.T. 232.  When a member of the

T.T. 232, 234.  Wallace testified that she "heard like a gun cock and then like three shots before [she] [and the others] ran in the house," after which she heard "a few more shots."  T.T. 179.

Jeremy Thomas ("Thomas"), who lived at 350 Woodlawn Avenue with his girlfriend and their children, testified that he was awakened by gunfire in the early morning of August 1, 2008. T.T. 209.  Thomas testified that he looked out the window and saw four to six people running on the far side of the building across from his apartment.  T.T. 210-212.  He testified that he went outside and saw his neighbors and some men from South Carolina, including one man who was talking to the police.  T.T. 213.

Tanisha Logan ("Logan") resided with her husband, Maurice Davis ("Davis" or "the victim"), and her children in a housing complex at 347 Woodlawn Avenue.  T.T. 76, 82.  On the evening of July 31, 2008, Logan, who was pregnant at the time with Davis's child, laid down on a downstairs couch while her husband watched television upstairs in the master bedroom.  Logan's three children and three of her nieces and nephews were also upstairs. T.T. 77-80.  At around 2:40 a.m., Logan heard "popping sounds" outside the apartment.  T.T. 80.  She then heard two "popping sounds" louder than the first and a loud crash from inside her apartment in the master bedroom on the second floor.  T.T. 80, 84.

---

audience told Harvard to "[t]ell the truth[,]" Harvard responded, "[t]hat's all I'm doing."  T.T. 232.  Harvard also testified, during direct examination, that he had initially lied to the police about his knowledge of the case, but after the police continued to interview him, he eventually broke down and told the truth.  T.T. 237-241.

Logan went upstairs and saw her husband, unresponsive, on the floor with "black liquid" near his head.  T.T. 86-87.

Logan, eager for help, ran downstairs and outside where she signaled to a neighbor who was standing on his front porch to come help.  The neighbor responded and checked on Davis, and then summoned the police, who had already arrived at the scene in response to the shooting.  T.T. 87.  Police Officer Darin Minch went to Logan's apartment and confirmed that Davis was dead. Officer Minch called for emergency medical services and secured the premises.  T.T. 123-125.

Police Captain Joseph Kane and Police Officers Patrick Fernan and Leo Timothy Dacey of the Elmira Police Department observed Davis lying on the floor in the master bedroom between the bed and furniture that was against the east wall.  T.T. 350, 352, 323, 324. Officer Fernan observed a bullet hole in the exterior wall of the bedroom that lined up with a bullet hole in the headboard of the bed.  T.T. 352.  A bullet was recovered on the floor of the bedroom closet.  T.T. 353.  Officer Fernan used a trajectory stick to determine the path that the bullet traveled, and concluded that it had been shot from a distance.  T.T. 354, 403, 367.  In the bedroom adjacent to the master bedroom, where the children were sleeping, Officer Dacey found a bullet hole in the north wall near a set of bunk beds and a bullet on the bedroom floor.  T.T. 325-328.

Shell casings were also found on the ground across the street from the victim's apartment near 348 to 358 Woodlawn Avenue. T.T. 369-374.  Police Sergeant Dennis Lyons of the State Police

Forensic Laboratory later compared four shell casings and determined that they were all expended from the same firearm. T.T. 465.  Officer Dacey also recovered and photographed a bullet casing in the doorway of 352 Woodlawn Avenue.  T.T. 331-336. Sergeant Lyons concluded that this fragment was consistent with the two projectiles recovered from the victim's apartment.  T.T. 481. Officer Dacey photographed the doorway of 354 Woodlawn Avenue, which had indentations he believed to be caused by bullet strikes. T.T. 333.

Investigator Lee Stonebreaker of the State Police Department assisted with measuring and diagramming the area of the shooting. T.T. 485, 489.  He opined that bullets fired from the area where the shell casings were found could have entered the apartment at 347 Woodlawn Avenue.  T.T. 523-524.

On August 2, 2008, Dr. Scott LaPointe performed an autopsy on the victim's body.  T.T. 446, 453-454.  Dr. LaPointe determined that the victim had suffered a single gunshot wound to his head that was the cause of his death.  T.T. 455, 457-458.

Police Officer Gregory James of the Elmira Police Department obtained an eavesdropping warrant on September 1, 2008.  T.T. 587. Two telephone conversations between Petitioner and Knox and Petitioner and Ross were played at trial.  T.T. 629-632.  In the first conversation, Petitioner and Knox discussed the police investigation surrounding the shooting and their suspicion that Harvard gave the police the names of the people present during the shooting and played a voicemail message for them.  In the second

conversation, Petitioner and Ross discussed the merits of potential testimony that could be given against them by others, including Watkins, Harvard, Knox, and Aaron Bacome.  See Record on Appeal (Resp't Ex. # 6) at 64, 71-95, 106-116, 137.

### 2.   The Defense's Case

Bruce Bacome testified for the defense.  He testified that on July 31, 2008, at around midnight, he was in Lando's Bar. T.T. 686-687.  According to him, "[e]verybody was having a good time."  T.T. 687.  He testified that he spoke with Petitioner and saw Ross and Knox.  T.T. 687-688.  At some point, an altercation broke out between Ross and someone from South Carolina.  T.T. 688-690.  By the time he got close to the altercation, it was almost over and eventually the police came.  T.T. 691.  Bruce Bacome and his brother Aaron Bacome left the bar shortly thereafter and went to their mother's house.   T.T. 691.   He testified that, at approximately 2:00 a.m., he left to go to a party at Hathorn Court, but, by the time he arrived, the party was over.  T.T. 691-692.  He testified that he saw a man he knew as "GQ" and the two men walked away from the party, talked, and smoked for about ten minutes. After doing so, he was ready to go home and began walking away.  As he did so, he ran into Petitioner, Ross, Knox and Harvard.  T.T. 698.   Harvard was "so intoxicated."   T.T. 700.   As he and Petitioner were walking, he heard three or four gunshots fired.  He testified that he did not see Petitioner with a gun.  T.T. 701.

Petitioner also testified in his defense.  According to him, he was close friends with Ross, Bruce Bacome, and Knox, but only an

associate of Harvard.  T.T. 753-756.  Petitioner testified that on the night of July 31, 2008, he went to Lando's Bar with Knox where he saw Ross, Bruce Bacome, Wallace, and the "South Carolina crew." T.T. 760.  Petitioner testified that fifteen to twenty minutes before the bar closed, Ross told Petitioner that he was about to leave because of problems with somebody at the bar.  T.T. 761. When the bar closed at 1:00 a.m., Petitioner saw a commotion outside and witnessed the men from South Carolina surround Ross and say to him that they were going to beat him up.  T.T. 762. Petitioner testified that one of the men from South Carolina screamed at Ross and then swung at him and missed.  Shortly thereafter, the police arrived and diffused the situation. Petitioner walked to the parking lot with Ross and told him not to worry about the altercation, which appeared to involve Ross's sister who was dating one of the men from South Carolina. T.T. 765.  Ross replied that he was not worried and would "see them when he [saw] them."  T.T. 765-766.  Petitioner then left the bar with Knox in Knox's car and Knox dropped Petitioner off at his house.  T.T. 768.  Petitioner testified that he took a shower and then received a call from Knox informing him of a party in Hathorn Court.  T.T. 768-769.  Petitioner agreed to meet Knox there. T.T. 769-770.

When Petitioner arrived in Hathorn Court, he parked his car and called Knox and eventually met up with Knox and Ross on the street.  T.T. 771-774.  Soon thereafter, Harvard arrived and the men all walked together into Hathorn Court.  T.T. 774-775.  As they

walked, they ran into Bruce Bacome who informed them that the party had broken up due to a fight.  T.T. 778.  Petitioner testified that he was talking to Bruce Bacome when he heard gunfire.  T.T. 779.  According to him, he ran towards his car and heard ten to fifteen additional shots.  Petitioner denied possessing a gun and denied seeing who fired the shots.  T.T. 779-780.  Petitioner drove home and called Knox.  He testified that he also spoke with Ross later that morning, but not to Harvard or Bruce Bacome.  T.T. 787-788.

On cross-examination, Petitioner testified that while in the Chemung County jail, he wrote Harvard a letter stating, among other things, that "[i]f you do take the stand, all you have to do is say you don't know who the shooter is and the police scared you so you made up a story so they would leave you alone."  T.T. 820-824.  In another letter to Harvard, Petitioner wrote that he had been having dreams involving Harvard where Petitioner "got out of jail . . . because [Harvard] came to [Petitioner's] trial and said [he] was really drunk and wasn't a 100 percent sure who was shooting."  T.T. 836-837.

On re-direct, Petitioner testified that he did not initiate the letter contact with Harvard.  He testified further that when he was talking to Ross on the recorded call, Ross did most of the talking.  T.T. 850.  Petitioner testified that, with respect to his statements on the recorded call, he had wished to speak to Harvard because he was concerned about Ross getting in trouble for the crimes because they were close friends and because Ross had

-9-

received a voicemail message from one of the South Carolina men stating, "you better shoot straighter, Romondo."   T.T. 851, 853-854.   Petitioner also testified that a couple of months earlier Ross had been convicted of murder.   T.T. 854.

### 3.   Verdict and Sentence

On June 5, 2009, the jury found Petitioner guilty of second degree murder (depraved indifference murder), first-degree manslaughter, attempted murder in the second degree, two counts of first-degree criminal use of a firearm in the first degree, and second-degree criminal possession of a weapon.   T.T. 1108-1109. The jury acquitted Petitioner of second-degree murder (intentional murder).   T.T. 1108.

Subsequently, the court sentenced Petitioner to an aggregate indeterminate term of seventeen and one-half years to life imprisonment, to be followed by a term of five years post-release supervision.   Sentencing Mins. [S.M.] 53-54.

### B.   Petitioner's Direct Appeal

Petitioner, through counsel, appealed his judgment of conviction in the Appellate Division, Third Department ("Appellate Division") on the following grounds: (1) the trial court erred in denying Petitioner's motion to dismiss the depraved indifference count; (2) the verdict was against the weight of the evidence; (3) the trial court erroneously submitted both the intentional and depraved indifference murder counts to the jury resulting in an inconsistent verdict; (4) the trial court erred in not permitting

Petitioner to present a witness to testify that a man named "Hick" was the shooter; and (5) the prosecutor engaged in misconduct during summation.  <u>See</u> Resp't Ex. A.

The Appellate Division modified the judgment by reversing Petitioner's convictions of manslaughter in the first degree and murder in the second degree, remitting the case to the county court for a new trial on count two (second-degree murder) and without prejudice to the People to re-present the charge of first degree manslaughter to a grand jury.  As modified, the Appellate Division unanimously affirmed the judgment of conviction.  <u>See</u> <u>People v. Molina</u>, 79 A.D.3d at 1373.  Petitioner sought leave to appeal with respect to the remaining convictions, which was denied on April 20, 2011.  <u>People v. Molina</u>, 16 N.Y.3d 861 (2011))(Resp't Ex. G).[3]

## C.    The Habeas Corpus Petition

This habeas corpus petition followed, wherein Petitioner, through counsel, seeks relief on the following grounds: (1) there was insufficient evidence to establish depraved indifference murder; (2) the trial court erred in submitting the depraved indifference murder count and the attempted murder count to the jury; (3) the trial court erred in refusing to allow Petitioner to present a defense witness to testify regarding another shooter; (4) the prosecutor committed misconduct by making improper comments

---

[3]    The People also sought leave to appeal based on the reversal of the first-degree manslaughter and second-degree murder convictions.  <u>See</u> Resp't Exs. E, F.  The Court denied the People's application in the same decision denying Petitioner's leave application.  <u>People v. Molina</u>, 16 N.Y.3d 861 (2011).

in his summation; (5) the jury instructions were erroneous; and
(6) the evidence obtained by the eavesdropping warrants should had
been suppressed.[4]  See Pet. (Dkt. No. 1)[5] at ¶¶ 30-41, Supporting
Mem. (Dkt. No.  2) at Points I-VI.

Respondent filed an Answer and Opposing Memorandum of Law.
Dkt. Nos. 10, 11.  Although afforded the opportunity, Petitioner
did not file a Reply.

## III. The Exhaustion Requirement

"An application for a writ of habeas corpus on behalf of a
person in custody pursuant to a judgment of a State court shall not
be granted unless it appears that . . . the applicant has exhausted
the remedies available in the courts of the State. . . ."  28
U.S.C. § 2254(b)(1)(A);  see, e.g., O'Sullivan v. Boerckel, 526
U.S. 838, 843-44 (1999);  accord, e.g., Bossett v. Walker, 41 F.3d
825, 828 (2d Cir. 1994), cert. denied, 514 U.S. 1054 (1995).

---

[4]

At ¶ 15 of the petition, Petitioner sets forth his claims as three
individual claims, one with four sub-parts.  See Pet. at ¶ 15.  Later, at ¶¶ 30-
41, he sets forth his claims as six separate grounds.  To avoid confusion and/or
inconsistencies, the Court parses out Petitioner's habeas claims as six distinct
claims (as set forth above) and refers to them accordingly with the numbers (1)
through (6) throughout this Decision and Order.

[5]

The Court notes that, at ¶ 10 of his counseled habeas petition, Petitioner
indicated that he intended to file a motion, pursuant to N.Y. Crim. Proc. Law §
440.10, to vacate his judgment of conviction in state court, and, upon doing so,
"will . . . seek to include the grounds in said motion in this habeas petition."
Pet. at ¶ 10.  He further stated that he "will . . . ask this Court, after filing
this petition, to hold a decision . . . in abeyance until he has exhausted his
state remedies . . . and thereafter moves to include the ground(s) in the 440.10
motion with this petition."  Id.  In a Decision and Order dated September 13,
2013, the Court construed these statements as a motion to stay, and denied the
motion without prejudice with leave to re-file within thirty days of the Court's
Order.  See Dkt. No. 15.  Petitioner did not re-file, and the Court therefore
proceeds to resolution of only the claims set forth in the habeas petition.

## IV.   The AEDPA Standard of Review

For federal constitutional claims adjudicated on the merits by a state court, the deferential standard of review codified in the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") applies. A habeas petitioner can only obtain habeas corpus relief by showing that the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was based on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."   28 U.S.C. § 2254(d)(1)-(2).

For those claims that were adjudicated on the merits in the state courts, the AEDPA standard of review applies.   Under that standard, Petitioner's claims are meritless, as discussed below.

## V.   Analysis of the Petition

## 1.   Grounds Two, Five, and Six are Unexhausted but Deemed Exhausted and Procedurally Defaulted

Petitioner argues that: (1) the trial court erred in submitting the depraved indifference murder count and the attempted murder count to the jury; (2) the jury instructions relating to firing the fatal shot were erroneous and the jury instructions on acting in concert were not supported by the evidence; and (3) the evidence obtained by the eavesdropping warrants should have been suppressed.   See Pet. at ¶¶ 34, 39-40, 41; Supporting Mem. at

Points II, V, VI.  For the reasons discussed below, these claims are unexhausted but deemed exhausted and procedurally defaulted from habeas review.

To properly exhaust a habeas claim, a petitioner is required to present that claim to each available level of the state courts. O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999) (a habeas petitioner must invoke "one complete round of the State's established appellate review process").  The petitioner also must have fairly presented the federal nature of his claim to the state courts.  Duncan v. Henry, 513 U.S. 364, 365 (1995) (per curiam); see also Baldwin v. Reese, 541 U.S. 27, 29-33 (2004).  A petitioner may apprise the state courts of the constitutional nature of his claims by explicitly arguing that a federal constitutional right was violated, either by citing to the Constitution or, "without citing chapter and verse of the Constitution," by the following means:  "(a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation." Smith v. Duncan, 411 F.3d 340, 348 (2d Cir. 2005) (quoting Daye v. Attorney Gen'l of N.Y., 696 F.2d 186, 194 (2d Cir. 1982) (en banc)).

In this case, Petitioner did not raise on direct appeal his claims related to the erroneous jury instructions and the eavesdropping warrant. See Resp't Ex. A. And, although he raised his claim that the trial court erred in submitting the depraved indifference murder count and the attempted murder count to the jury on direct appeal, he narrowly framed it as a state law issue citing only to state caselaw. See Resp't Ex. A at 52. Petitioner also failed to include this particular claim in his leave application. Instead, he sought review of his claims that the verdict was against the weight of the evidence, that the prosecutor committed misconduct on summation, and that he was deprived of his right to call a defense witness. See Resp't Ex. D. Consequently, these three claims -- that the trial court erred in submitting the depraved indifference murder count and the attempted murder count to the jury, that the jury instructions were erroneous, and the evidence obtained by the eavesdropping warrants should have been suppressed -- remain unexhausted.

When claims have not been fully exhausted by a habeas petitioner, a federal court may find that there is an absence of available state remedies when "it is clear that the unexhausted claim is procedurally barred by state law and, as such, its presentation in the state forum would be futile." Aparicio v. Artuz, 269 F.3d 78, 90 (2d Cir. 2001); Robinson v. Superintendent, Green Haven Correctional Facility, No. 09-CV-1904, 2012 U.S. Dist. LEXIS 5244, 2012 WL 123263, at *4 (E.D.N.Y. Jan. 17, 2012) (citing

-15-

<u>Aparicio</u>).    Here,  Petitioner  has  used  his  one  appeal  to  the
Appellate  Division,  and  collateral  review  of  these  record-based
claims by way of a motion to vacate is also foreclosed.  <u>See</u> N.Y.
Ct.  Rules  §  500.20(a)  (permitting  the  filing  of  only  one  direct
appeal  and  one  application  for  leave  to  appeal  to  the  Court  of
Appeals); N.Y. Crim. Proc. Law ("CPL") § 440.10(2)(a), (c) (motion
to vacate must be denied where claim is record-based and was denied
on  the  merits  on  direct  appeal  or  could  have  been  raised  on  direct
appeal  but  unjustifiably  was  not).    Thus,  it  would  be  futile  for
Petitioner to return to state court to exhaust these claims and the
Court  therefore  deems  them  exhausted  but  procedurally  defaulted
from habeas review.

Federal  courts  may  only  consider  the  merits  of  procedurally
defaulted claims where the petitioner can establish both cause for
his  procedural  default  and  resulting  prejudice  or,  alternatively,
that  a  fundamental  miscarriage  of  justice  would  occur  absent
federal  court  review  of  the  claims.  <u>Acosta v. Artuz</u>, 575 F.3d 177,
184 (2d Cir. 2009) (citation omitted);  <u>Smith v. Fischer</u>, No. 07
CIV.  2966,  2012  U.S.  Dist.  LEXIS  29010,  2012  WL  695432,  at  *16
(S.D.N.Y.  Mar.  5,  2012)  (citations  omitted).    To  establish  legal
"cause"  which  would  enable  this  Court  to  consider  Petitioner's
procedurally forfeited claims, he must show that some objective,
external  factor  impeded  his  ability  to  fully  exhaust  them.    <u>See</u>
<u>Eckhardt  v.  Superintendent,  Attica  Correctional  Facility</u>,
No. 9:04-CV-0559 (GLS/GHL), 2008 U.S. Dist. LEXIS 118609, 2008 WL

8156688, at *7 (N.D.N.Y. Mar. 25, 2008); <u>Doleo v. Reynolds</u>, No. 00 CIV.7927, 2002 U.S. Dist. LEXIS 8090, 2002 WL 922260, at *3 (S.D.N.Y. May 7, 2002). Petitioner asserts, generally, at ¶ 34 of his habeas petition, that ineffective assistance of counsel is the cause for this default. Pet. at ¶ 34. Indeed, ineffective assistance of counsel may establish cause for the default. <u>See</u> <u>Edwards v. Carpenter</u>, 529 U.S. 446, 451-52 (2000). However, it is well settled that "the exhaustion doctrine . . . generally requires that a claim of ineffective assistance be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default." <u>Murray v. Carrier</u>, 477 U.S. 478, 488-89 (1986). Here, Petitioner failed to raise a stand-alone ineffective assistance of counsel claim in the state courts either on direct appeal or in a CPL § 440.10 motion. He is therefore precluded from relying on ineffective assistance of counsel to establish cause with respect to these claims. <u>See</u> <u>Zelaya v.</u> <u>Mantello</u>, No. 00 Civ. 0865, 2003 U.S. Dist. LEXIS 15822, 2003 WL 22097510, at *5 (S.D.N.Y. Sept. 10, 2003) ("[Petitioner] did not raise any claim of ineffective assistance of counsel on his direct appeal, and he has not brought a § 440.10 motion to attack his conviction on that ground. Therefore, [petitioner's] ineffective assistance of counsel claim remains unexhausted and may not be used to establish cause for the procedural default of his underlying claim." (internal citations omitted)). Since petitioner has not established that legal cause exists which excuses his procedural

default, this Court need not consider whether he has suffered the requisite prejudice. See Stepney v. Lopes, 760 F.2d 40, 45 (2d Cir. 1985); Collazo v. Lee, No. 11 CIV. 1804, 2011 U.S. Dist. LEXIS 138825, 2011 WL 6026301, at *3 (E.D.N.Y. Dec. 2, 2011) (finding that because petitioner "failed to show 'cause' for his procedural default, this Court does not need to determine whether he suffered prejudice because relief is unavailable unless both cause and prejudice have been established") (citing Stepney).  Nor has Petitioner established that the Court's failure to review the claim would result in a fundamental miscarriage of justice, since Petitioner has not come forward with any evidence which would have undermined the proof of his guilt presented at trial. See Caswell v. Racetti, 11-CV-0153 MAT, 2012 U.S. Dist. LEXIS 41220, 2012 WL 1029457 at *6 (W.D.N.Y. Mar. 26, 2012).

Accordingly, the Court finds that these three claims are unexhausted but deemed exhausted and procedurally defaulted from habeas review. Grounds two, five, and six are therefore denied.

## 2.   Ground Three is Meritless

Petitioner argues, as he did on direct appeal, that he was deprived of his right to present a defense when the trial court precluded him from introducing the testimony of Courtney Cade ("Cade") that a man named "Hick" was the shooter.  Pet. at ¶¶ 35-37. The Appellate Division denied this claim on the merits.

Molina, 79 A.D.3d at 1376.  For the reasons discussed below, this claim is meritless.

Although "[t]he Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense," Crane v. Kentucky, 476 U.S. 683, 690 (1986) (internal quotation marks omitted), this right is not unlimited.  United States v. Scheffer, 523 U.S. 303, 308 (1998).  Trial courts enjoy "wide latitude," particularly to "exclude evidence through the application of evidentiary rules that themselves serve the interests of fairness and reliability."  Crane, 476 U.S. at 689-90.  Thus, where an evidentiary ruling was correct pursuant to a state evidentiary rule, a federal habeas court may reverse only if the rule is "arbitrary or disproportionate to the purposes [it is] designed to serve," meaning that it has "infringed upon a weighty interest of the accused."  Scheffer, 523 U.S. at 308, 330;  Hawkins v. Costello, 460 F.3d 238, 244-45 (2d Cir. 2006).

In this case, the defense made an offer of proof as to Cade's potential testimony.  Defense counsel explained that Cade would testify that a man named "Hick" had approached him and requested that he dispose of a weapon that "Hick" stated "had a body on it" from Hathorn Court, and that "Hick" allegedly was responsible for "killing the man."  T.T. 749-751.  Cade's testimony contained out-of-court statements which defense counsel intended to offer for the truth of the matter asserted, that is, to prove that "Hick" was the shooter.  Thus, as the trial court found and the Appellate Division

-19-

affirmed, Cade's testimony as to "Hick's" statement was inadmissible hearsay. T.T. 751; see Molina, 79 A.D.3d at 1376. Therefore, Cade's testimony would only be admissible if it fit within a hearsay exception.  In this case, it appears that the only hearsay exception that could have been applied to admit "Hick's" statement would have been a declaration against penal interest. Under New York law, for this exception to apply, "supporting circumstances independent of the statement itself must be present to attest to its trustworthiness and reliability."  People v. Settles, 46 N.Y.2d 154, 167 (1978).  Petitioner was unable to satisfy this requirement since there was no independent evidence to confirm the veracity of "Hick's" statement.  Despite Petitioner's contentions to the contrary, there is nothing in the trial record that suggests that "Hick" was the shooter or that "Hick" was otherwise connected to the shooting.  Accordingly, the Court cannot find that the application of New York's hearsay rule in this particular case was improper.

Moreover, this decision was not unconstitutionally arbitrary or disproportionate to the rule's purposes.  Although the Supreme Court has traditionally been "reluctan[t] to impose constitutional constraints on ordinary evidentiary rulings by state trial courts," Crane, 476 U.S. at 689, in Chambers v. Mississippi, the Supreme Court did hold that "mechanistic" application of hearsay rules to preclude evidence of third party culpability may violate due

process where the evidence "[bears] persuasive assurances of trustworthiness" and where the declarant is available to be cross-examined at trial. 410 U.S. at 300-02. Here, however, no evidence outside of "Hick's" statements corroborated the theory that "Hick" was the shooter. Further, "Hick", who the defense was unable to locate, was not available to testify at trial. T.T. 751. The trial court's exclusion of the evidence therefore did not run afoul of <u>Chambers</u>. Given the strength of the evidence inculpating Petitioner, the Court cannot find that the trial court's exclusion of Cade's testimony as to Hick's statements amounted to a violation of Petitioner's constitutional rights. <u>See</u> <u>Watson v. Greene</u>, 640 F.3d 501, 511 (2d Cir. 2011).

Accordingly, the Court finds that the state court's adjudication of this claim did not contravene, or unreasonably apply, clearly established Supreme Court law. Nor can it be said that the state court's determination was unreasonable in light of the facts presented at trial. The claim is therefore denied.

**3.   Ground Four is Meritless**

Petitioner asserts, as he did on direct appeal, that he was denied a fair trial by improper comments made by the prosecution during summation. Specifically, Petitioner maintains that the prosecutor made improper references, shifted the burden of proof, and vouched for the testimony of prosecution witness Harvard. Pet. at ¶ 38; Supporting Mem. at Point V. The Appellate Division

rejected this claim on the merits. <u>Molina</u>, 79 A.D.3d at 1377.  The Court finds that this claim is meritless.

As a general matter, the Supreme Court has stated that prosecutorial comments constitute a constitutional violation only if they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 643 (1974).  The threshold question is whether the comments were improper.  This determination must be made by considering the cumulative effect of the comments as a whole, <u>see, e.g.</u>, <u>Floyd v. Meachum</u>, 907 F.2d 347, 353 (2d Cir. 1990), in the context of the entire trial.  <u>See, e.g.</u>, <u>Donnelly</u>, 416 U.S. at 643; <u>Miranda v. Bennett</u>, 322 F.3d 171, 181 (2d Cir. 2003) ("[t]he merits of a fair trial claim will depend on the likely impact of the misconduct in light of the trial proceedings as a whole.").

If the comments at issue are improper the court must determine whether the challenged remarks "were so prejudicial that they rendered the trial in question fundamentally unfair." <u>Floyd</u>, 907 F.2d at 353 (1990) (quoting <u>Garofolo v. Coomb</u>, 804 F.2d 201, 206 (2d Cir. 1986)).  "It is not enough that the prosecutors' remarks were undesirable or even universally condemned. The relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." <u>Darden v. Wainwright</u>, 477 U.S. 168, 181 (1986)

(citations omitted). In collateral attacks on state court convictions, as on direct appeal, the Second Circuit applies a three-factor test in assessing whether the challenged comments created "substantial prejudice": "the severity of the misconduct; the measures adopted to cure the misconduct; and the certainty of conviction absent the improper statements." Floyd, 907 F.2d at 355 (quoting United States v. Modica, 663 F.2d 1173, 1181 (2d Cir. 1981)); accord United States v. Thomas, 377 F.3d 232, 246 (2d Cir. 2004); Bentley v. Scully, 41 F.3d 818 (2d Cir. 1994); United States v. Rivera, 22 F.3d 430, 437 (2d Cir. 1994).

Here, Petitioner advances several challenges to the prosecutor's closing argument: (1) he disputes the propriety of the prosecutor's use of the term "red herring" to describe the defense's criticism of the police investigation surrounding the shooting and his suggestion that Frederick Glenn ("Glenn") -- a person who allegedly committed an unrelated robbery around the time of the shooting -- was the shooter; (2) he claims it was improper for the prosecutor to have referred to comments made during jury selection when asking potential jurors "if [they] had courage to stand by at the end of this case, if [they] were convinced beyond a reasonable doubt, if [they] had the courage to find [Petitioner] guilty"; (3) he argues that the prosecutor unfairly vouched for prosecution witness Harvard's credibility and improperly shifted the burden of proof by questioning the defense's theory of the

case; and (4) he argues that it was improper for the prosecutor to ask the jury, "[how] would you like it if somebody walked up and down your street firing at your house."  Pet. at ¶ 38.

As a threshold matter, it is doubtful that the complained of comments set forth at (1), (2), and (3) above were improper. Certainly, the prosecutor's use of the term "red herring" to describe the defense's criticism during summation of the police investigation is far from the type of comment "designed to appeal to the jury's emotions or to 'inflame the passions or prejudices of the jury'", United States v. Peterson, 808 F.2d 969, 977 (2d Cir. 1987) (quoting American Bar Association Standard 3-5.8(c)), and is not comparable to those found to be "clearly improper" by courts in this circuit.  See, e.g., Hirsch v. Plescia, No. 03-CV-l 617 (DLI), 2005 U.S. Dist. LEXIS 46558, 2005 WL 2038587, at *6 (E.D.N.Y. Aug. 23, 2005) (comments that petitioner was a "sadistic" "animal" were improper); see also Harper v. Kelly, 704 F. Supp. 375, 379-80 (S.D.N.Y. 1989) (use of term "red herrings" by prosecutor while referring to defense in summation within the range of allowed behavior).  Further, the prosecutor's use of the term was not improper to the extent it was a reminder to the jury to determine the truth based upon the evidence presented at trial, and because it was made in response to the defense's summation that the police did a poor job investigating the case.  T.T. 942, 943, 957, 968, 969, 976, 979.  Notably, the prosecutor specifically explained to

the jury the origin of the term and that he was using it to mean that defense counsel was pointing out different details to distract the jurors from the truth, thereby clearing up any ambiguity or confusion resulting from the use of this term.  T.T. 976.

Similarly, the prosecutor's reference to comments made during jury selection when asking potential jurors "if [they] had courage to stand by at the end of this case, if [they] were convinced beyond a reasonable doubt, if [they] had the courage to find [Petitioner] guilty" (T.T. 985), was not improper.  When read in context, the prosecutor's statement was simply an admonition to the jury to ignore "outside influences" and to consider both the evidence and the law and to apply the proper standard -- guilt beyond a reasonable doubt -- in arriving at a decision.  Moreover, the prosecutor emphasized at several times in his summation that he maintained the burden of proving Petitioner's guilt beyond a reasonable doubt and that the jury could find Petitioner guilty only if it was "convinced beyond a reasonable doubt," thus avoiding any confusion that the State, and not Petitioner, bore the burden of proof.  T.T. 970, 985.

Likewise, the prosecutor did not improperly "vouch" for prosecution witness Harvard by stating that Harvard had acted courageously by testifying truthfully against his friend.  Here, the prosecutor's comment was made in response to the defense's lengthy statement during summation that Harvard was lying, in which

-25-

he explained how and in what ways Harvard was not a credible witness.  T.T. 927-941.  <u>See, e.g.,</u> <u>Escobar v. Senkowski</u>, No. 02 Civ. 8066 (LAK) (THK), 2005 U.S. Dist. LEXIS 44164 (S.D.N.Y. May 26, 2005) (allowing prosecutorial "leeway" in arguing against credibility of witnesses when responding to defense summation); <u>Garbez v. Greiner</u>, No. 01 Civ. 9865 (LAK), 2002 U.S. Dist. LEXIS 13806 (S.D.N.Y. July 30, 2002) (citing <u>United States v. Young</u>, 470 U.S. 1, 12-13 (1985)) (finding, where defense's summation attacked credibility of People's witnesses, that People were invited to respond in kind).

Further, the prosecutor did not improperly shift the burden of proof to petitioner by questioning the defense's theory of the case when he stated, "[a]nd by the way, what's the defense?"  T.T. 994. A review of the comment in context reveals that this comment was not an improper prompt for the defendant to prove his innocence, but rather a rhetorical device employed by the prosecutor to emphasize the improbability of the defense's suggestion during summation that Ross was the shooter.  T.T. 994.  After posing the rhetorical question to the jury, the prosecutor stated, "[t[he defense, if you listened to the summation, the defense is still that we haven't heard the whole truth.  Because still there's cover up for Romondo Ross, there's a cover up for Romondo Ross.  Really?"  T.T. 994.  The prosecutor then drew the jury's attention to the fact that Ross had already been convicted (T.T. 994), thus

emphasizing the unlikelihood that Petitioner was taking responsibility for the crime to protect Ross.

Even *assuming arguendo* the complained of comments set forth at (1), (2) and (3) above, either singly or in combination, were improper, they do not approach the level of prejudice required to entitle petitioner to the relief he seeks. First, the prosecutor's statements were not severe. As noted above, the allegedly improper comments were brief and relegated during summation, an area during trial in which the prosecution enjoys broad leeway. United States v. Edwards, 342 F.3d 168, 181 (2d Cir. 2003)("The government has broad latitude in the inferences it may reasonably suggest to the jury during summation."), quoting United States v. Zackson, 12 F.3d 1178 (2d Cir. 1993). Second, the trial court instructed the jury before summations that each party's closing statement was merely argument and that the jury could accept or reject these arguments. T.T. 919-920. The trial court also instructed the jury prior to deliberations on the presumption of innocence and that the People bore the burden of proof and that the burden never shifts to the defendant. T.T. 1021-1022. A jury is "presumed to follow their instructions[,]" Richardson v. Marsh, 481 U.S. 200, 211 (1987), and the record discloses no reason why this presumption should not apply here. See Wicks v. Miller, 05 Civ. 5341 (JGK), 2007 U.S. Dist. LEXIS 35868, 2007 WL 1434992 at *6 (S.D.N.Y. May 15, 2007)(Koeltl, D.J.)(jury not unduly influenced by prosecutor's

comments concerning the evidence during opening statement where trial court instructed jury that only its recollection of the evidence controlled).   Third, Petitioner's conviction was established notwithstanding the prosecutor's comments because the prosecution presented substantial evidence of petitioner's guilt. The prosecution presented testimony from numerous witnesses (including witness Harvard who testified that he saw Petitioner pull a gun from his waistband and began shooting), wiretap evidence of two telephone conversations between Petitioner and others discussing the shooting, as well as physical evidence recovered by the police from the scene of the crime.  Given the strong evidence of guilt presented at trial, coupled with the fact that the prosecutor's comments were limited and made in response to the defense's summation, petitioner has failed to establish that, even if the prosecutor's arguments were improper, they had a substantial or injurious effect or influence on the jury's verdict.   See Bentley v. Scully, 41 F.3d 818, 825 (2d Cir. 1994) ("Because of the compelling evidence in the prosecution's case against [petitioner], as well as the fact that the prosecutor's summation comments were both brief and isolated, we find that [petitioner] has failed to demonstrate that the prosecutor's misconduct had a substantial or injurious effect on the jury's verdict.").

With respect to the complained of comment set forth at (4) above (i.e., when the prosecutor stated, "[h]ow would you like it

if somebody walked up and down your street and starting firing at
your houses?") (T.T. 1009), this comment was arguably improper
given that it appears to have been an attempt to appeal to the
jurors' emotions rather than their reason/logic by emphasizing that
families and children lived in the apartment complex where the
shooting occurred.  The statement appears to have been made solely
for the purpose of evoking an emotional response from the jury,
namely that the jurors should be fearful of Petitioner and
concerned for the safety of their families and children.
T.T. 1008-1009.  Nonetheless, even assuming this statement was
improper, it did not result in prejudice to Petitioner.  This is so
because the record reflects that this brief comment was immediately
objected to by the defense on the grounds that it was an "improper
summation," and thereafter withdrawn by the prosecution.
T.T. 1009.  The prosecutor then rephrased his argument, asking the
jury instead to "[i]magine someone walking up and down a street
firing a gun at houses, whether it's a multiple complex like this
or just down a nice neighborhood street."  T.T. 1009.  Given the
compelling evidence in the prosecution's case against Petitioner,
as well as the fact that the prosecutor's comment was of a brief
and fleeting nature, the Court finds that Petitioner has not and
cannot demonstrate that the prosecutor's misconduct had a
substantial or injurious effect on the jury's verdict.

In sum, the Court finds that the state court's adjudication of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.   Accordingly, the Court finds the claim meritless, and denies it on this basis.

## 3.   Ground One is Moot

Petitioner maintains "that there was insufficient evidence to support the count charging depraved indifference murder, and therefore the count should have been dismissed." Pet. ¶ 30.   He argues that although the Appellate Division reversed his conviction of first-degree manslaughter and second-degree murder, the state could still retry him and that said "retrial would violate [his] rights under the due process and double jeopardy clauses of the United States Constitution."[6]   Id. Respondent asserts that the Appellate Division's reversal of Petitioner's first-degree manslaughter and second-degree murder convictions renders the claim moot.   See Resp't Mem. at Point I.   The Court agrees with Respondent and finds that the claim is moot, as discussed below.

---

[6]   As an initial matter, Petitioner's claim that there was insufficient evidence to support the depraved indifference murder count is unexhausted.   As Respondent correctly notes in its opposing memorandum (see Resp't Mem. at 22), Petitioner failed to include his legal insufficiency claim in his leave application, thereby rendering the claim unexhausted.   Moreover, the Court notes that to the extent Petitioner now raises his legal insufficiency claim in the context of an alleged violation of his constitutional due process and double jeopardy rights, the claim is raised for the first time in the instant proceeding and is therefore unexhausted for purposes of federal habeas review.   Petitioner's failure to exhaust, however, is not fatal to this Court's disposition of his application on the merits.   Because the Court finds the claim to be wholly meritless, it has the discretion to dismiss the petition notwithstanding Petitioner's failure to exhaust.   See 28 U.S.C. § 2254(b)(2); Pratt v. Greiner, 306 F.3d 1190, 1197 (2d Cir. 2002).

Article III, Section 2 of the United States Constitution limits the subject matter of the federal courts to those cases which present a "case or controversy." <u>Spencer v. Kemna</u>, 523 U.S. 1, 6 (1998); <u>Greif v. Wilson, Elser, Moskowitz, Edelman & Dicker LLP</u>, 258 F. Supp. 2d 157 (E.D.N.Y. 2003).   An actual case or controversy must exist at all stages of federal court proceedings to support subject matter jurisdiction.   U.S. Const. Art. III. Thus, a case is moot "when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." <u>City of Erie v. Pap's A.M.</u>, 529 U.S. 277, 287 (2000) (internal quotation marks and citations omitted);   <u>Lavin v. United States</u>, 299 F.3d 123, 128 (2d Cir. 2002).   "The hallmark of a moot case or controversy is that the relief sought can no longer be given or is no longer needed."   <u>Martin-Trigona v. Shiff</u>, 702 F.2d 380, 386 (2d Cir. 1983).

Here, the Appellate Division reversed Petitioner's convictions of first-degree manslaughter and second-degree murder, and the Court therefore finds that the instant claim is now moot. Moreover, the Court finds no basis to entertain Petitioner's moot claim.   Although, as Petitioner points out, the Appellate Division remitted the matter to the county court for a new trial on the second-degree murder conviction and permitted the People to re-present the charge of first-degree manslaughter to a grand jury, the District Attorney elected not to do so and the county court

closed the case allowing the sentence, as modified, to stand.  See Resp't Ex. H (Dec. & Order of the Chemung County Court dated 03/01/2012).  Thus, it cannot be said that "there is a reasonable expectation that [Petitioner] will be subject to the same action again."  Weinstein, 423 U.S. at 149.

Accordingly, the Court finds Petitioner's claim is moot and denies it on this basis.

## VI.  Conclusion

For the reasons stated above, the petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Dkt. No. 1) is denied, and the petition is dismissed.  Because Petitioner has failed to make "a substantial showing of a denial of a constitutional right," 28 U.S.C. § 2253(c)(2), the Court declines to issue a certificate of appealability.  See, e.g., Lucidore v. New York State Div. of Parole, 209 F.3d 107, 111-113 (2d Cir. 2000).  The Court also hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this judgment would not be taken in good faith and therefore denies leave to appeal as a poor person.  Coppedge v. United States, 369 U.S. 438 (1962).

Petitioner must file any notice of appeal with the Clerk's Office, United States District Court, Western District of New York, within thirty (30) days of the date of judgment in this action. Requests to proceed on appeal as a poor person must be filed with

United States Court of Appeals for the Second Circuit in accordance
with the requirements of Rule 24 of the Federal Rules of Appellate
Procedure.

**IT IS SO ORDERED**.

S/Michael A. Telesca

_____

HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:     January 24, 2014
           Rochester, New York